Clerk, please call the next case. 1092699 Case of Grzeskiwicz v. Mecca Airlines Counsel, please. Good morning, Your Honors. May it please the Court, Counsel. This is an appeal by the plaintiff, Case Grzeskiwicz, who is the baggage handler. Who are you? My name is Steve Sachs. I represent the petitioner appellants. I'm also here on behalf of Ivan Rittenberg, who wrote this brief. I did assist him, but he's unfortunately out of town and could not make it. What we have here are certain errors of law, fact, and procedure. We have the commission and the appellate court affirming American Airlines' denial of benefits on an opinion that had no grounding in methodology and should have been stricken by the Fry Rule. A Fry hearing should have been held to withhold this evidence, and it's inadmissible evidence. Was that simply because what? Well, who's the doctor again that said? Dr. Walsh is the doctor whose opinion followed, and Dr. Walsh was the third expert that American Airlines hired to generate an opinion about the petitioner's back. It's just a statement that chronology alone does not establish causal connection. Is that true? What he's saying is it does not matter the fact that the petitioner had no pain before this accident, then there's a claimed accident, and then there was pain and injury afterwards. He says that that has no bearing on his determination of whether or not there was an injury. Well, how does that violate the Fry standard? You understand what Fry is. Fry applies when there's some type of a novel medical or scientific principle involved in the opinion. Walsh's opinion had nothing to do with any medical or scientific principle. Are you claiming that his opinion was premised upon some new or novel scientific principle or test? Yes. What would that be? That chronology has no effect on causality. We have 70 years of Supreme Court instruction in the case of Plano Foundry back in 1934, Westinghouse in 79, International Harvester in 82. And all those cases show a recognized rule that when you have an injury, chronology is important. Did Walsh say it had no effect, or did he say chronology alone does not establish causation? He says chronology... He says direct causal connection can be established only if I were to walk out that door and have a compound fracture, literally. The fall would then cause the causal connection between the compound fracture, so there would be a connection between the compound fracture and the fall. But he simply... Did Dr. Newman help you? Dr. Newman says, yes, the accident was related to the... Sorry, the injury was related to the accident, and so did the other expert hired by American Airlines who said that the injury was related to the accident. However, Dr. Newman... The knee injury was related? Now, the knee injury is a separate issue. And the knee injury, he said, was not related. However, that opinion was based on facts that simply did not exist. And so that was a faulty opinion, not because of the methodology, but because of the facts that were used. What were the issues on this appeal? There were about nine different issues on appeal. Whether the back, whether their denial of penalties, the IWCC's denial of penalties for A's withholding compensation for the back injury was warranted. I mean, I can get to that in a bit. But whether or not the finding that the knee was not related was against the manifest way of the evidence was another. Well, while you're on that, didn't the claimant clearly acknowledge that he was walking at home when he felt like his knee exploded? Yes, he did. He was walking at home, correct? Correct. So how does that relate back to his work? Because on November 8th, 2004, is the date of the original accident. The step that we talk about at home was December 3rd. He does report knee pain continuously from the time of the accident until that time when he took a step at home. I mean, I thought of an analogy that if you run over a curb with your car and you break the oil pan, it's going to take a few miles before the engine decides to seize up when you step on the gas. So there isn't a... Hold on. You've got how many doctors that say, okay, that incident resulted in a knee injury? Every single treating doctor. Every single treating doctor. Correct. And you have Dr. Walsh that comes on and says, no, it doesn't. And he's speculating that there's preexisting arthritis, preexisting conditions, when the facts are clear that the petitioner lifted between 5 and 150 pounds every day for the last five years. He played on American Airlines hockey teams, their basketball teams. He coached tennis. He never missed any time for knee pain, for back pain. And the commission made a finding of fact that he was in good health at the time of the accident. Walsh wasn't the only contrary medical opinion, was it? What about Dr. Newman? How do you assess his testimony? Well, at the time, Dr. Newman and then also Dr. Ghanayem made their opinions. That was while there was three opinions over the course of this proceeding. Conservative care was still what was being recommended by all the doctors. So when American Airlines relied on those opinions later on, those opinions were already stale. They were outdated. And so, yes, they both said that the back injury was related to the accident, but they said that no surgery is warranted at that time. And at that time, that was an opinion that maybe was reasonable for American Airlines to follow, but as you'll see as the months went on during that summer of 2005, conservative care failed. He had a number of epidural steroid injections, and after that, it was prescribed for him to have spinal fusion. Dr. Walsh said that that surgery was necessary, but, of course, he said that the accident was or the injury was unrelated to the accident. All right, so there was some ostensible conflicting medical opinions, correct? Correct. Okay. So under the well-settled legal doctrine that it's within the province of the commission to assess the credibility of the witnesses, the strength and weight to be given to the evidence, why couldn't they choose the opinions of the opposing doctors over the plaintiff's doctors? Why can't they do that? Okay. For the issue of the back, we have Dr. Walsh's opinion, which, again, is based on a faulty methodology. He admits that there is the need for surgery. He says that there is no causal connection between the accident and the injury. What did the second IME report by Dr. Newman show? I believe Dr. Newman was the first report, but it said that they suspected degenerative arthritis. I'll help you a little bit. The petitioner didn't show up for that IME. Right. Why not? There was some sort of issue with him being noncompliant, and that was April 4th with him being noncompliant with the IME. However, what we have is the period of time when they stopped paying TTD was February 20th. This IME was April 14th. And when Petitioner's Counsel filed a petition for penalties, a 19B, American Airlines did not deny that they didn't pay compensation. Instead, they justified it by saying that he didn't comply with this IME on April 14th. So what happened between February 20th and April 14th that warranted their nonpayment? We have a presumption that 14 days of nonpayment is evidence of unreasonable behavior. All they have to rely on is the fact that he was uncooperative for this IME. Are you talking about the penalties? I guess I'm getting to that, too, yes. Okay. What did the commission say about the penalties? They said that they were not warranted. They said that American Airlines acted reasonably. Is that all they said? They denied penalties. Did they say anything else? I'm sure they said some things, but I'm not sure what you're getting at. Well, I don't think it's important to you. Did the commission say you could refile? They struck that eventually. And that's a separate issue. That's a separate penalties petition. That's after they cut off TTD the second time based on Dr. Walsh's opinion. And that's one of the procedural issues that I'm talking about, is that they struck that petition with only one commissioner. And I think the rules are clear that there needs to be a quorum, three commissioners, and a majority of that panel in order to strike a petition. A petition for penalties is the same thing as a petition for review. Didn't the commission say, no, but you can refile your penalty? They did say that, but their act in striking it was wrong. It was wrong even in the face of the medical opinions to support the denial of liability. I mean, they clearly had some, as you acknowledge, medical evidence to support their position. The medical evidence, though, is not based on correct facts. As we said, we have Dr. Walsh. Well, how do they know that? They should know that. Some of these facts are clear. The fact that when he had these surgeries, there's no evidence of any arthritis in his knee. He had healthy cartilage tissue. All they found was a crater in the osteochondral elements of his leg. And we have all the evidence of him being healthy before that. All the doctors say, the treating doctors say that there is no way that you can have a crater like that without some sort of traumatic injury. And as all the evidence that's undisputed shows, he had no problems before that. And that was also a finding of fact by the commission. How could they reasonably rely on a finding by Dr. Walsh that says he has preexisting arthritis when there's no evidence of arthritis? They should have known that. They had all the records. They had the surgical reports. So they're not supposed to rely on their doctor's opinion. The problem is, any time now, they can come up with a doctor's opinion that says that tidal waves from the moon or black magic is the cause of there being no connection or no relation, and they can find themselves to reasonably rely on that. It defeats the whole purpose. Walsh said that there's tidal waves on the moon, but I don't know that he exactly said that. Right. But they're saying that we have an opinion that's based on no understood or accepted scientific methodology of causation. And so what that is, the implications of that is they can come up with any opinion, as long as it has an MD stamp on the end of it, and whether or not it's based in reason or fact or scientific principle, they can reasonably rely on that to withhold benefits. And, you know, what we see here is the practical implementation of this is you have respondents and employers squeezing these petitioners to either come back to work before they're ready or to have the treatment paid for by somebody else. And as long as they can hold out on these petitioners for no reason at all, the whole purpose, you know, we know that the Axe purpose is speedy, remedial care for the injured worker. And that's completely defeated. You had three commissioners who have done a lot of work as commissioners, Lambourne, Sherman, and Dauphin, and you couldn't convince any of them. I couldn't convince them. I didn't try to convince them. But the fact is that the evidence that was used to convince them was just faulty. A FRI hearing should have been held, and that evidence should have been admissible. And without that evidence, they would have had no reasonable basis to rely on the opinions that they did, and I think the commission would have come up with a different decision. I'm having a hard time with that because it seems like, you know, we learned a long time ago that correlation isn't the same as causation. Absolutely. I'm with you on that. However, it's something that needs to be considered. And if you have evidence of somebody who's asymptomatic before a certain place and time, you cannot ignore that evidence, that the fact there's a reported injury, it's undisputed, nobody disputes that he had this injury when he's trying to separate a hitch, that he had to get in a position to lift a lot of weight. There's no dispute that this incident happened. You can't just ignore the fact that he had no problems before that in generating an opinion. Otherwise, you're just cherry-picking the evidence and coming up with an opinion that's not based on the facts. I'm trying to get a timeline on these penalties. Your first request for penalties was for nonpayment of TTD for what period of time? From February 20th, 2005 to April 14th. And there was an agreed order then in May which acknowledged that there was some back pay. However, American Airlines relied on the noncompliance of this April 14th IME as the reason for terminating TTD. Well, they terminated TTD a few months earlier. They served no justification for the termination of TTD. And you entered into some agreement and got the back TTD through a fine? Yes. There was an agreed order entered in May. And basically, he'll show up to the IME and you pay back the TTD? They did. There was an order to pay, yes, back TTD. Okay. So now what you're saying is they paid the back TTD pursuant to that agreement. He'll show up for an IME. He really needs to get some penalties on top of the TTD for that period of time, correct? Is that what you're looking at? They paid. I'm sorry. I'm just trying to make sure. Your time is up for right now. Okay. Thank you. Counsel, please. Good morning, Your Honors. My name is Dan Grant. I represent the employer in this matter, American Airlines. Can you clarify that last point for me that he's saying that there was a period of time in February until April, okay, that there was no TTD? Okay. Thank you for the facts. Paid. And then you're saying, well, because he didn't comply with an IME request, then there was a later order under the agreed order that you're going to obtain that TTD for that time that you ceased it. Is that what you're looking for penalties on? He's saying there's no basis in February for the cessation of TTD. Well, in terms of that period of TTD, the reason he was off work was due to the unrelated knee condition. He had knee surgery with Dr. Mess. I believe it was on February 10th of 2005. So that's why there was a dispute concerning TTD during that period of time. He was off work treating for the knee condition that was denied. And then the dispute continued. This is my understanding. I didn't refer to Dr. Mess. That was denied. We have him off before that time, am I correct? Yes. And is there any opinion that there's MMI reached before the knee surgery? Well, in terms of knee surgery, that was the denied case. We already had our opinion that that was not work-related. So that's why that period was denied. You had that in February? Yeah. We denied the knee condition all along. On the basis of what? There were four bases that we denied and the commission denied. Council touched on- Let's talk about your actions before we ever got to the commission. Our actions were denied upon the fact that Tishner did not report knee pain immediately after the accident. This was a point of contention in the different briefs. He complained of radiating pain down his right leg immediately following the accident, which precipitated a lumbar MRI, not a knee MRI. There was issues about, you know, he's not a doctor, he doesn't know. He obviously was able to say he had knee pain after he stepped at home. And after he stepped at home, when he said his knee exploded, he went back and saw his treating doctor who immediately noted that he reported a sudden onset of pain in his knee and recommended a right knee MRI. So there was a clear change in the treatment. Before he stepped at home, it was all relating to the low back. He had radicular pain going down his right leg. Isn't there something in the records that that radicular apathy also ended up in the knee? Well, I mean, by radicular pain, it can radiate down to the right leg, but there was never a specific mention of knee pain. It was radiated to his thigh. And, again, his treating doctors, you know, those are the doctors that he was relying upon, never diagnosed him with knee pain and never prescribed any treatment or diagnostic testing to address the knee pain. That all came after the December, I think it was, third or fourth incident that he had at home. So there was, as I said, there was a clear dividing line as to what the treatment was relating to before and after that step at home. Well, I'm still guessing I'm unclear. Up to that point that he's having knee surgery, is he receiving TTD? Yes, it was my understanding he was. Again, I don't have that information to find. I'm sorry. Okay, so you're saying, okay, this knee is something else that happened. Yeah, the knee was happening at home. Now, but is there anything to suggest that he could have gone back to work or reached MMI because of the back at the time you seized pain TDD? Admittedly, I'm not sure if he was even off work at that time relative to his low back. Again, I wish I would have seen this. You know it makes a difference. It does. Yeah. It does. And, you know, I know there's case law that allows for the ongoing disability even when there's a non-work-related cause. Correct. Like it was the Christmas or Christman case or whatever. Right. So, yes, I am aware of that. I'm just not certain as to the facts. Some of the facts are what I'm suspecting they might be that he's still off. Yeah. And you agree to kick back the TDD if he shows up for the IME. You all worked that out. Yeah, we worked that out. Do you think that you're still obligated to pay if it's found to be an improper cessation of TDDs and penalties? Yeah, I don't think so. We had an agreed order and, again. The agreed order just covered kicking back TDD. I mean, I think that's the genesis of why I have an agreed order. If you're still liable for TDD, you might as well just take it to trial. I think that would have a chilling effect on that type of an agreed order because if I'm going to still be exposed to TDD benefits, why not take it to trial? Why not continue to litigate that issue because he has to show up for an IME by rule of Section 12 of the Act. Yeah, but you can't say I quit TDD benefits in February because he didn't show up for an IME. No, and that was counsel's allegation. It's my understanding that TDD benefits were not paid because he was off work due to the unrelated knee condition. So you buy into a chronology argument there? I guess I could speak to that issue right now, the whole chronology argument and the Frye standard. First, obviously, Walsh, he recognizes Walsh. The opinion of Walsh becomes a substantial impediment to his case. So what is your response to his argument that somehow this chronology argument was inadmissible under Frye? Well, I guess I would start by noting that he didn't raise this argument until he was at the circuit court level. This wasn't made an issue at arbitration. The commissioners didn't review this. He didn't question Dr. Walsh when he deposed him as to whether this was some type of a different new or novel scientific technique. So he didn't go get his own opinion from any of his experts concerning his testimony. And I don't think that's actually the genesis of Dr. Walsh's testimony. Dr. Walsh essentially said that was a question that counsel had posed to him. Dr. Walsh essentially said that the petitioner was suffering from a degenerative condition in his back, spondylolisthesis, and he didn't feel that the lifting or any type of a pulling accident would have caused or aggravated that condition to the point that it required surgery. And I don't think there's anything new or novel about that testimony. He's basically saying that this activity, in my experience, does not cause an aggravation of a degenerative condition. So you're saying the Frey test has nothing to do with that opinion? Absolutely. I think, you know, in this case, you know, he keeps pointing back to the chronology equals causal connection and states to the seven years of case line, that's a legal argument. There's not a case in medical or, as far as I know, there's not a class in medical school that discusses chronology can equal causal connection. This is a legal theory, and that's how I outlined it in my brief. This is a legal theory of recovery. This is not something that's a medical issue. This is something that the courts have established to find cases responsible and find it, you know, to get down that road. And I just don't see that being a medical issue. And, again, he doesn't have any testimony from any experts of his own that this in any way violated the Frey standard. And the commission and the arbitrator didn't weigh in on this issue. It was never brought to their attention. He said there should have been a separate Frey hearing. They never requested one. The slip sheet never put the Frey issue in dispute. So the commission didn't consider the Frey standard and also didn't weigh the facts. So I think, you know, had he wanted to raise that issue, it should have been raised at the time of trial. I want to get something straight about these penalties. You've got two periods here, as I understand it. You've got February 20th, 2005 through April the 13th of 2005. Is that right? Yes. The commission never ruled on that. I believe they didn't rule on it because that was part of the agreed order. It's certainly not in the arbitrator's decision. I would agree with that. There's nothing in the arbitrator's decision about this period of time from February to April of 2005. And April of 2006 to December of 2006 is subsequent to the Walsh opinion, is it not? That's correct. And they did rule on that. That's correct. And they said it wasn't unreasonable based on Walsh's opinion, which is, I guess, their call. Yeah, and that's correct. Yeah, there was a number of issues in terms of the penalties that were raised, one related to the denial of diffusion and then the other one related to the ---- Was there ever a petition filed for penalties for the February, for the nonpayment of TTD for the period from February 2005 to April 2005? Your Honor, I'm sorry. I'm not certain. Possibly counsel could speak to that, but, you know, as the city today, I'm not certain. I only, if I recall, I don't believe I've addressed that in my brief with respect to that period of TTD. Because, like I said, the issues that were contained in the arbitrator's decision related to diffusion and to the period of TTD that you just spoke to. And, again, I believe there's sufficient evidence in the record to support those decisions. And I think the commission did a good job of weighing the evidence. You know, they didn't, they ended up adopting the findings of Dr. Slack and Dr. Bergen, but at the same time they considered Dr. Ghanaian and Dr. Walsh's opinion concerning diffusion and the TTD. And in terms of the leg, or the right knee, there is sufficient evidence in the record, as we discussed, to claim its own testimony. And the fact that immediately after the step of home, he sought medical treatment relating to the knee, identifying the knee, and had a diagnostic test relating to the knee. There was nothing before that. And then further, Dr. Newman and Dr. Walsh's opinions both were that the right knee was not caused related to the accident in question. So I believe there's sufficient evidence in the record to affirm the commission's decision in its entirety. Thank you, counsel. Thank you, Your Honor. Please. I'm kind of patient for a real quick here. Where will I find the table of contents of the record on appeal in your appendix? The table of contents of the record on appeal should be right at the very beginning. Actually, no, Your Honor, it appears to be missing. There is no table of contents of the record on appeal. I do not see it. Just getting into the May 12th agreed order about the TTD, that was for four weeks of TTD. What we were talking about before was a TTD nonpayment from February 20th until April 14th. There's four weeks after that April 14th until May 12th. So we still have TTD that is not being paid, that penalty should have been assessed on. And what period of time is that, then? The February 20th to April 14th. Well, it presupposes you filed a petition for those fees. And there was a petition filed. Where is it? I mean, I have no table of contents of the record on appeal, so I can't find it. You got a page number? I have it in a ‑‑ yes, I do. It was on record 983 and 984. Or actually, that was their response. Ours was on 980. 980? Yeah. And their response was 983, 984, which did not deny the fact that they hadn't paid TTD. Regarding the knee injury that they say was the reason why they didn't pay him TTD during this time, he was also off work for his back. And I think the case law is clear that even if you're also off work for, arguendo, a nonrelated knee injury, even though it was related, if you're off work because you cannot work because of a work‑related injury, you are entitled to TTD. Regarding the knee and the pain that he reported, he reported pain on 1116, which is the first time he saw the doctor after the 11‑8 accident. It was the first time he could get in. On 1129, the doctor's note specifically says he's feeling pain in his knee and paresthesia in the calf and the knee. Regarding the Fry argument that was raised before the industrial commission, it was in the statement of exceptions the petitioner filed to the commission. And as far as the evidence, the burden is on the respondent to prove that their evidence is admissible in that case. One thing I didn't get to mention in my initial statement was the penalties that should be assessed for their delay in paying the 117 weeks of TTD that the arbitrator ordered. They took an unnecessary review that was not grounded in any reasonable scientific basis in denying this treatment or denying the TTD that was ordered to be paid. Again, there was no ‑‑ they really had no valid reason for saying that the back injury was not related. The arbitrator awarded that. Their review had no merit. And so penalties should have been awarded, but they were not. Thank you, counsel. Thank you. Because we'll take the matter under advisory for disposition.